UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHONY PICENTE,<br><br>                    Petitioner,<br><br>          vs.<br><br>WILLIAM LEE,[1] Superintendent, Green<br>Haven Correctional Facility,<br><br>                    Respondent. | No. 9:08-cv-00358-JKS<br><br>MEMORANDUM DECISION |

Petitioner Anthony Picente, a state prisoner appearing through counsel, has filed a petition for habeas corpus relief under 28 U.S.C. § 2254.  Picente is currently in the custody of the New York Department of Correctional Services, incarcerated at the Green Haven Correctional Facility.  Respondent has answered.  Picente has not replied.

I.  BACKGROUND/PRIOR PROCEEDINGS

Following a jury trial, Picente was convicted in the Oneida County Court of one count each of Sodomy in the First Degree (N.Y. Penal Law § 130.50) and Sodomy in the Second Degree (N.Y. Penal Law § 130.45), and three counts of Endangering the Welfare of a Child (N.Y. Penal Law § 260.10[1]).  Picente was charged with acts occurring during February and March of 2001.  As to the first count (first-degree sodomy), the verdict form specifically asked: "If you found the defendant guilty of the First Count, next answer this question:  Did the People prove beyond a reasonable doubt that the act of Sodomy occurred on or after February 1, 2001?"

---

[1] William Lee, Superintendent, Green Haven Correctional Facility, is substituted for Michael Corcoran, Superintendent, Cayuga Correctional Facility.  Fed. R. Civ. P. 25(d).

The jury answered that question "No."  Picente filed a post-verdict motion to set aside the jury verdict under N.Y. Criminal Procedure Law § 330.30 on the grounds that the jury had not found that Picente had committed the crimes of which he was charged, during the time period charged. The Oneida County Court dismissed Picente's conviction on the Sodomy in the First-Degree charge, but declined to dismiss Picente's conviction on the remaining charges on which the jury had found Picente guilty.  The Oneida County Court then sentenced Picente to an indeterminate prison term of two and one-third years to seven years on the sodomy conviction and concurrent terms of one year on each of the child endangerment convictions.  Picente timely appealed his conviction and sentence to the Appellate Division, Fourth Department, which affirmed his conviction and sentence in a published decision.  The New York Court of Appeals denied leave to appeal on April 20, 2007,[2] and Picente timely filed his petition in this Court on April 1, 2008.

The facts underlying the convictions, as set forth in Respondent's answer are:[3]

###### 1.	The People's Case

Prior to July 8, 2003, M.L., who was thirteen at the time of trial, lived with [Picente], who was his step-father, and his mother, and his sister, A.L, who was fourteen years old at the time of trial (T: 205-06, 262-63).[1]  M.L. and A.L. had lived with [Picente] for about ten years (T: 207-08, 264).

[1]Numbers preceded by "T" refer to the pages of the trial transcript; those preceded by "S" refer to the pages of the sentencing minutes.

M.L. played hockey during the 2001-02 season with his friend, C.H. (T: 208).  One night in February or March 2001, when M.L. was ten, and A.L. was eleven, C.H. slept over because they had a hockey game the next day (T: 208-10, 267, 314-15).[2]  Mark Harjung, the President of the Clinton

[2] *People v. Picente*, 825 N.Y.S.2d 629 (N.Y.A.D. 2006), *lv. denied*, 868 N.E.2d 242 (N.Y. 2007) (Table).

[3] The Appellate Division did not recite the facts underlying Picente's conviction.  Picente did not traverse the answer.  Therefore, the Court accepts Respondent's factual recitation as true. Respondent's footnotes appear immediately following the paragraph containing the footnote.

Youth Hockey Association, spoke with the coach for M.L.'s and C.H.'s team and he confirmed that the boys played in a tournament on March 1st, 2nd, 3rd, and 4th (T: 382).

[2]M.L. did not know the exact date, but it was during "tournament time," which is generally around February or March (T: 213-14). On cross-examination, M.L. testified that he did not know that the crime occurred in February or March, that the police put those words in his mouth, and that the tournaments start after December 8th (T: 221, 223). A.L. testified that it occurred during the winter, but it could have been December or January (T: 287). C.H. could not recall what month the hockey game occurred (T: 345).

[Picente] and A.L were there, but M.L.'s mother was working. At some point, [Picente], A.L., M.L. and C.H. went to pick up another friend, S.C, who was ten years old (T: 368). When they arrived at [Picente's] house, they all went upstairs to a bedroom and C.H., M.L, and A.L. took their clothes off and threw them at S.C., who was standing in the doorway. Then, C.L., who was nine or ten at the time, and A.L, who was eleven, started having sex (T: 211, 215, 224, 271, 315, 317, 342, 357-58, 369).[3] C.H. asked S.C. if he wanted to "suck" on A.L.'s breasts and when S.C. started doing it, [Picente] came upstairs and told S.C. and A.L. to continue (T: 359). [Picente] watched S.C. as he sucked on A.L.'s breasts and told S.C. that he was doing it wrong. [Picente] told S.C. to "rub his tongue around the nipple and suck at the same time" (T: 360). C.H. suggested that A.L. perform oral sex on S.C. and [Picente] motioned that it was okay. After performing oral sex on S.C., A.L. had sex with M.L., while [Picente] watched (T: 360-6, 372]). After A.L. had sex with M.L., C.H. said that his penis could not become erect (T: 362). [Picente] told C.H. to suck on A.L.'s breasts and then his penis would become erect; C.H. complied (T: 362).

[3]M.L. could not recall whether S.C. was there at the time, A.L. denied that he was there, but C.H. recalled that S.C was there, as did S.C., himself (T: 224, 271, 315).

M.L. testified that [Picente] was in the room watching television at the time this all happened, and A.L. testified that [Picente] walked in while she and C.L. were having sex and [Picente] watched (T: 216, 272, 295, 320). M.L. denied that he had sex with A.L, but both A.L. and C.L. recalled that he had (T: 224-25, 272-73, 317). C.L. testified that after they all had sex, A.L. performed oral sex on S.C., who touched or kissed A.L.'s breasts (T: 318-20, 342).

Then, they all went downstairs. C.H. and S.C. testified that S.C. went to the bathroom for five or ten minutes while the rest of them discussed oral sex (T: 321-22, 335, 362). [Picente] then performed oral sex on A.L. (T: 323). [Picente] told M.L., A.L., and C.H. not to tell anyone (T: 324). The next morning, S.C. saw [Picente], and [Picente] told S.C. not to tell anyone what had happened (T: 364). S.C. went home and vomited and cried (T: 365).

3

According to A.L., they all talked about what had happened upstairs, including [Picente], but nothing happened after that (T: 277-78). In July 2003, A.L. told her friend, Sarah Dawes, that [Picente] had performed oral sex on her (T: 282-83, 304, 349).  A.L. also told a child advocate that [Picente] had performed oral sex on her, and she also testified in the grand jury that [Picente] performed oral sex on her (T: 306-07).[4]  In a sworn statement to the police, A.L. had stated that [Picente] had performed oral sex on her for two minutes (T: 279-80).

[4]A.L. testified that she wished that she had not told Sarah what had happened because her life had "fallen apart" since she did; A.L. lost a lot of personal things that she used to have, such as her horse, partly because [Picente] was no longer in the house and as a result, her family had less money (T: 307-08).

M.L. testified that he and C.H. dared [Picente] to perform oral sex on A.L. A.L. took off her pants and underwear, but M.L. did not know what happened next because he was watching television (T: 218, 227, 248).  S.C. testified that when they went downstairs, everyone except for S.C. and [Picente] were naked; [Picente] and S.C. had their underwear on (T: 371).  The prosecutor asked M.L. if it would refresh his recollection if he saw a statement that he gave to the police on July 9, 2003.  M.L. said that it would.  After reading the statement, M.L. testified that he told the police that [Picente] performed oral sex on A.L. (T: 219).  M.L. said that he only gave that sworn statement to the police because he wanted to leave (T: 219).  M.L. admitted that he also testified in the grand jury that [Picente] put his mouth on A.L's vagina (T: 220).

On cross-examination, M.L. testified that the police came to his house in July at 11:30 and asked him "stupid questions" (T: 228).[5]  M.L. told the police what he remembered, but he did not remember everything (T: 232). [Picente] was later asked to give a written statement, too.  When M.L. saw the statement it already had a signature, but he never signed it.  The statement indicated that M.L. saw [Picente] perform oral sex on A.L. for ten seconds, but M.L. did not really see that (T: 233).[6]  In the grand jury, however, M.L. testified that he saw [Picente] perform oral sex on A.L. (T: 245).  S.C. also met with a police officer and signed a statement on January 12th (T: 374).

[5]A few months before trial, defense counsel began representing M.L. in an unrelated civil action (T: 220-21).

[6]Defense counsel elicited on cross-examination that when M.L. was questioned by the assistant district attorney and he denied that [Picente] performed oral sex, the assistant district attorney told M.L. that changing his statement constituted perjury and he could be "pulled into Family Court" (T: 242).

In July 2003, A.L. told her friend, Sarah Dawes, what had happened. Sarah told her neighbor's mother, Lynn Myers, and ultimately the police came to their home on July 8, 2003 (T: 349-50, 352).  C.H. came to Sarah's house and

4

spoke with the police; Sarah also spoke with the police, who had her arrange for A.L. to come to Sarah's house.  When A.L. arrived, she spoke with the police, too (T: 350, 352, 444).

A.L. then called [Picente] who arrived a few minutes later (T: 420, 446). [Picente] then spoke to Police Officer Kevin Revere, the coordinator for the child advocacy center at the Oneida County District Attorney's Office, and Police Investigator Daniel LaBella, who was also assigned to the child advocacy center (T: 398, 442, 446).  The three went to the Kirkland Police Department where Investigator LaBella read [Picente] Miranda warnings (T: 400–02, 447-48). At 10:58 p.m.,[Picente] initialed the waiver form, indicating that he understood the rights and that he was willing to speak to the police without an attorney (T: 402-06, 450-56).  When they began speaking with [Picente], [Picente] denied that the crime took place; he also told the police to speak to M.L. about what had happened (T: 408, 425, 458).  Investigator LaBella then left to speak with M.L. while Revere stayed with [Picente] (T: 408, 458).

When Investigator LaBella returned, he said that he interviewed M.L., took down [Picente's] statement using a laptop computer, and told [Picente] that M.L. had confirmed what his sister had said earlier (T: 410-11, 426, 459, 463). [Picente] had previously denied committing the crime before that and M.L.'s account conflicted with [Picente's] denial (T: 410).

[Picente] continued to deny that he committed any crime, but then admitted that he discovered the children engaged in sexual activity and then took part in it (T: 411, 460).  After the statement was completed, the police printed it out and asked [Picente] to read a portion of it out loud so the police could determine whether [Picente] read English (T: 415).  [Picente] was able to read English and he never indicated that he needed glasses (T: 415-16, 468).  [Picente] made a few changes and signed the statement (T: 416, 465-66, 469-70).

### 2.    Petitioner's Case

Doctor John J. Costello, Sr. was a practicing optometrist and [Picente] was one of his patients (T: 501-02).  At his first examination on September 10, 2003, Dr. Costello determined that [Picente's] vision was 20/200 in his right eye and 20/80 in his left eye without glasses, and the doctor prescribed lenses for [Picente] (T: 502-03, 517).  Dr. Costello opined that [Picente] could not have read the statements that had been prepared by the police officers without glasses (T: 508). [Picente] told Dr. Costello that he wore his glasses all the time (T: 515).

[Picente] testified on his own behalf. He testified that on the night of the incident, he and A.L. and M.L picked up the other kids and bought pizza and wings (T: 537, 563-64).  The other kids were staying the night because some of them had a hockey game the next day in Rome, New York (T: 537, 564, 596). They were getting wild, running up and down the stairs, so [Picente] went upstairs and told them to calm down (T: 538, 564).  They had several mattresses spread out on the floor and that is where they intended to sleep for the night.  The kids

came downstairs and C.H. started asking [Picente] about performing oral sex on a girl. C.H. asked [Picente] to show C.H. how to do it. M.L. told [Picente] that he would get in trouble and [Picente] told M.L. that he would not do anything like that (T: 540, 565-66). [Picente] told this to the police, but they refused to listen to him (T: 541). The kids went to bed around 10:00 or 11:00 p.m. (T: 541). A.L. slept in her own room (T: 543). [Picente] denied that there was any sexual activity in the living room involving A.L. and he denied touching A.L. (T: 541-42).

In late June, M.L. came to [Picente] and told him that C.H. told Sarah Dawes that he and A.L. had sex, that [Picente] was involved, as well, and that Sarah had told her parents. [Picente] told M.L. that it was just kids talking and that M.L. should "let them talk" (T: 545). In July, [Picente] received a phone call from his daughter, who was crying on the phone saying that she had a problem (T: 545). [Picente] went to the Dawes' house to pick her up and testified that he drove without his glasses on (T: 546, 590).

At the Dawes' house, [Picente] was greeted by the two police officers (T: 546). They drove [Picente] to the Kirkland Police Department and ushered him to a small room. That is where the officers questioned [Picente] (T: 548, 569). [Picente] claimed that Officer LaBella started reading him his rights, but Investigator Revere said that [Picente] did not need his rights, because he saw enough of that on television. Revere asked [Picente] to sign the paper, but [Picente] said that everything was blurry. [Picente] signed the form where Revere told him to sign it (T: 548).

After [Picente] denied that any sexual activity had occurred, [Picente] suggested that the police speak to M.L. Officer LaBella went to talk to M.L., while [Picente] remained at the police station with Investigator Revere (T: 553). When the police came back, they told [Picente] that they had three different stories. [Picente] then asked for his lawyer and Revere told [Picente] he did not need a lawyer (T: 554). The police told [Picente] that they would type out what [Picente] told them and it was not incriminating (T: 555). [Picente] was not able to read the statement, but he initialed it (T: 556-60).

People's Exhibit 3 was an incriminating statement. [Picente] denied that he made the statement, but admitted that he had signed it (T: 584). In the statement, [Picente] indicated that he had received his rights and that he had told the police that he watched C.H. and A.L. have sex (T: 585). [Picente] also told the police that he watched A.L. and M.L. "rub on each other naked," and [Picente] knew that he should have stopped them (T: 586). [Picente] also told the police that he licked A.L.'s vagina (T: 587).

## II. ISSUES PRESENTED/DEFENSES

In his petition, Picente raises two grounds: (1) the charges should have been dismissed

because the jury did not find that the acts occurred at the time specified in the indictment and Bill

of Particulars; and (2) the prosecution improperly used prior statements made by a witness to the police and during grand jury testimony to impeach the witness at trial.  Respondent contends that Picente's first ground is procedurally barred and the second ground is unexhausted.  Respondent raises no other affirmative defense.[4]

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, this Court cannot grant relief unless the decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court rendered its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[5]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[6]  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.[7]  Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[8]  When a claim falls under the

---

[4] *See* Rules—Section 2254 Cases, Rule 5(b).

[5] 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 404-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[6] *Williams*, 529 U.S. at 412.

[7] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[8] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations by the Court); *see Wright v. Van*
(continued...)

"unreasonable application" prong, a state court's application of Supreme Court precedent must be objectively unreasonable, not just incorrect or erroneous.[9]  The Supreme Court has made clear that the objectively unreasonable standard is a substantially higher threshold than simply believing that the state court determination was incorrect.[10]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[11]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[12]  Picente "bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated."[13]

In applying this standard, this Court reviews the last reasoned decision by the state court.[14]  In addition, the state court's findings of fact are presumed to be correct unless the

---

[8](...continued)
*Patten*, 552 U.S. 120, 127 (2008) (per curiam).

[9] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[10] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[11] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

[12] *See Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[13] *Hawkins v. Costello*, 460 F.3d 238, 246 (2d Cir. 2006) (internal quotation marks and citation omitted).

[14] *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson,* 229 F.3d 112, 118 (2d Cir. 2000).

petitioner rebuts this presumption by clear and convincing evidence.[15]  Although pre-AEDPA

precedent established that deference is due to findings of state appellate courts,[16] the Second

Circuit has left the question open with respect to AEDPA cases.[17]  In the absence of clear

indication from the Second Circuit to the contrary, this Court can find no principled reason not to

apply the same rule in the context of AEDPA, *i.e.*, findings of a state appellate court are

presumed to be correct.

IV.  DISCUSSION

**A.  Failure to Traverse**.

Picente has not traversed the answer.  28 U.S.C. § 2248 provides:

> The allegations of a return to the writ of habeas corpus or of an answer to an order
> to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as
> true except to the extent that the judge finds from the evidence that they are not
> true.

Ordinarily, under § 2248, where there is no denial of the Respondent's allegations in the

answer, or the denial is merely formal unsupported by an evidentiary basis, the Court must accept

Respondent's allegations.[18]  Where there is no traverse filed and no evidence offered to

contradict the allegations of the return, they must be accepted as true.[19]  In this case, however,

Picente anticipated the procedural default affirmative defense raised by Respondent to the first

---

[15] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[16] *See Sumner v. Mata*, 449 U.S. 539, 547 (1981); *Ventura v. Meachum*, 957 F.2d 1048, 1055 (2d Cir. 1992).

[17] *See Boyette v. Lefevre*, 246 F.3d 76, 88 n.7 (2d Cir. 2001).

[18] *See Carlson v. Landon*, 342 U.S. 524, 530 (1952).

[19] *United States ex rel. Catalano v. Shaughnessy*, 197 F.2d 65, 66 (2d Cir. 1952) (per curiam).

ground.  Consequently, although no traverse was filed, to the extent that he has addressed it in the Memorandum of Law accompanying the petition, Picente has effectively joined the issue of the applicability of the procedural bar defense to the first ground.

**B.  Grounds Raised**.

Ground 1:  Dismissal of Charges.

Picente argues that because the jury did not find that he had committed the acts of which he was charged during the time span charged, all charges, not just the first-degree sodomy charge, should have been dismissed.  The Appellate Division, in rejecting Picente's argument, held:

> [Picente] failed to preserve for our review his contention that the proof with respect to the date of the commission of the crimes renders the evidence legally insufficient to support the conviction.  [Picente] did not seek dismissal of the counts at issue on that ground (citation omitted), and his CPL 330.30 motion is insufficient to preserve his present contention for our review (citations omitted). In any event, [Picente's] contention lacks merit because the precise date of the commission of the crimes is not an essential element thereof (citations omitted).[20]

Respondent argues that Picente's first ground is procedurally barred.  This Court agrees. Under the adequate-and-independent-state-ground doctrine, federal courts may not review the judgment of a state court that "rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision."[21]  Because this doctrine applies on federal habeas review and because the state-law ground may be a procedural bar,[22] federal habeas courts often speak of an "adequate and independent procedural bar" to federal

---

[20] *Picente*, 825 N.Y.S.2d at 629.

[21] *Harris v. Reed,* 489 U.S. 255, 260 (1989).

[22] *Id.* at 261-62.

10

review of a claim or simply of a "procedurally barred" federal claim.  A federal habeas court lacks jurisdiction to evaluate questions of federal law decided by a state court where the state court judgment "rests on a state law ground that is independent of the federal question and adequate to support the judgment."[23]  Where a decision "fairly appear[s] to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion," habeas courts presume that there is no adequate and independent state law ground supporting the judgment.[24]  This rule even applies where the state court has ruled on the merits in the alternative.[25]  Finally, "[s]tate courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims."[26]  Accordingly, a procedural bar will be deemed "adequate" only if it is based on a rule that is "firmly established and regularly followed" by the state in question.[27]

To classify the decision as either fairly appearing to rest primarily on or interwoven with federal law, or as resting primarily on state procedural law, this Court looks to three factors:  (1) the face of the state court opinion; (2) whether the state court was aware of a procedural bar; and (3) the practice of state courts in similar circumstances.[28]  There is no question that the Appellate Division explicitly invoked the state procedural rule as barring review.  Looking behind the

---

[23] *Coleman v. Thompson,* 501 U.S. 722, 729 (1991).

[24] *Id.* at 735.

[25] *Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005).

[26] *Hathorn v. Lovorn,* 457 U.S. 255, 263 (1982).

[27] *Ford v. Georgia,* 498 U.S. 411, 423-24 (1991).

[28] *Jimenez v. Walker*, 458 F.3d 130, 145 and n.16 (2d Cir. 2006).

asserted state law grounds, as the Court must, the Court agrees with Respondent that the procedural ground cited by the Appellate Division, unpreserved for review, is firmly established and regularly followed by the New York courts.[29]  To avoid this bar, Picente must demonstrate cause for the default and actual prejudice, *i.e.*, that the failure to consider the claims will result in a fundamental miscarriage of justice.[30]  To prove a fundamental miscarriage of justice, Picente must show that a constitutional violation probably resulted in his conviction despite his actual innocence.[31]  Although at the gateway stage Picente need not establish his innocence as an "absolute certainty," Picente must demonstrate that more likely than not, no reasonable juror could find him guilty beyond a reasonable doubt.[32]

Picente argues that the Appellate Division misapplied the rule that precludes appellate review of issues unpreserved for review.  Picente, citing New York appellate cases, contends that his § 330.30 motion was sufficient to preserve the issue for review under New York law. Picente's argument raises an issue of state law beyond the purview of this Court in a federal habeas proceeding.  It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.[33]  A fundamental principle of our federal

---

[29] *See Rhagi v. Artuz*, 309 F.3d 103, 106-07 (2d Cir. 2002).

[30] *Coleman*, 501 U.S. at 750.

[31] *See Schlup v. Delo,* 513 U.S. 298, 321-25 (1995) (linking miscarriages of justice to actual innocence); *United States v. Olano,* 507 U.S. 725, 736 (1993) ("In our collateral-review jurisprudence, the term 'miscarriage of justice' means that the defendant is actually innocent."); *Murray v. Carrier,* 477 U.S. 478, 496 (1986) ("in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.")

[32] *House v. Bell*, 547 U.S. 518, 538 (2006).

[33] *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot
(continued...)

system is "that a state court's interpretation of state law, including one announced on direct appeal from the challenged conviction, binds a federal court sitting in habeas corpus."[34]  A determination of state law by a state intermediate appellate court is also binding in a federal habeas action.[35]  This is especially true where, as in this case, the highest court in the state has denied review of the lower court's decision.[36]

Picente has fallen far short of establishing the necessary elements to avoid the application of the procedural bar rule.  Even if Picente could possibly show cause, he cannot show a fundamental miscarriage of justice.  Picente does not even attempt to argue that he is innocent of the charges.  Indeed, the evidence that Picente committed the crimes of which he was convicted is overwhelming.[37]  Moreover, even if this Court could reach the merits, Picente would not prevail.  This Court does not disagree with Picente's argument that it is a fundamental constitutional principle that the State must prove all elements of the crime beyond a reasonable

---

[33](...continued)
reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (it is presumed that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Engle v. Isaac*, 456 U.S. 107, 119 (1982) (challenging the correctness of the application of state law does not allege a deprivation of federal rights sufficient for habeas relief); *Bell v. Cone,* 543 U.S. 447, 455 (2005) (a federal court may not lightly presume that a state court failed to apply its own law).

[34] *Bradshaw v. Richey,* 546 U.S. 74, 76, (2005); *see West v. AT&T,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

[35] *See Hicks v. Feiock,* 485 U.S. 624, 629-30 & n.3 (1988) (noting state appellate court's determination of state law is binding and must be given deference).

[36] *Id.*; *see also West,* 311 U.S. at 237 ("This is the more so where, as in this case, the highest court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court.").

[37] Picente's confession was admitted into evidence.  Its admission or the voluntariness of his statement to the police is not at issue in this proceeding.

13

doubt.[38]  As noted above, however, the Appellate Division addressed this issue in the alternative, and held that the "the precise date of the commission of the crimes is not an essential element thereof."  In this case, the Appellate Division, a state court interpreting state law, determined that the precise date of the criminal acts was not an essential element of the crimes of which Picente was charged.  Review of that decision is beyond the purview of this Court in a federal habeas proceeding.  Picente is not entitled to relief under his first ground.

Ground 2:  Improper Impeachment.

The prosecution in this case was permitted to present to the jury statements made to the police and grand jury testimony of a witness and one of the victims that contradicted their testimony at trial.  Picente argues that this was impermissible on two bases:  (1) "CPL 60.35 'manifestly permits impeachment only when the testimony of the witness in court *affirmatively damages* the case of the party calling him.'"[39] and (2) the federal evidentiary rule that "the government (or indeed any party) 'may not call a witness whose testimony it knows to be adverse for the sole purpose of impeaching him and thereby presenting evidence to the jury that would not otherwise be admissible.'"[40]  The Appellate Division rejected Picente's arguments, holding:

> Contrary to [Picente's] further contention, County Court properly allowed the People to impeach the victim with her prior inconsistent statements inasmuch as her trial testimony was affirmatively damaging to the People's case (citations omitted).  [Picente] failed to preserve for our review his contention that the court erred in allowing the People to impeach the victim's brother with his supporting deposition and grand jury testimony (citation omitted).  In any event, we conclude

---

[38] *In re Winship*, 397 U.S. 358, 364 (1970).

[39] Quoting *People v. Fitzpatrick*, 40 N.Y.2d 44, 51 [351 N.E.2d 675, 679] (1976) (emphasis the court's).

[40] Quoting *United States v. Eisen*, 974 F.2d 246, 262 (2d Cir. 1992) (emphasis in the original).

14

that any error by the court in allowing that impeachment is harmless (citations omitted).[41]

The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts."[42]  "The introduction of unfairly prejudicial evidence against a defendant in a criminal trial . . . . does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental conceptions of justice."[43]  "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."[44]  In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in Federal Constitution."  For example, the Supreme Court has barred the introduction of evidence in State criminal proceedings that violated the Fourth Amendment (search and seizure),[45] Fifth Amendment (confessions),[46] Sixth Amendment (Confrontation Clause),[47] and Sixth Amendment (right to counsel).[48]  In deciding cases involving the Federal Rules of Evidence or federal evidentiary statutes, the Supreme Court

---

[41] *Picente*, 825 N.Y.S.2d at 629-30.

[42] *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).

[43] *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir. 1998).

[44] *Estelle*, 502 U.S. at 72 (quoting *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983)).

[45] *Mapp v. Ohio*, 367 U.S. 643 (1961).

[46] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[47] *Crawford v. Washington*, 541 U.S. 36 (2004); *Pointer v. Texas*, 380 U.S. 400 (1965) (transcript of preliminary hearing without assistance of counsel to confront and cross-examine absent witness inadmissible).

[48] *Burgett v. Texas*, 389 U.S. 109, 114-15 (evidence of prior conviction obtained in violation of Sixth Amendment right to counsel inadmissible).

is acting in its supervisory capacity over the lower federal courts.[49]  "'Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.'"[50]

Insofar as Picente argues that the Appellate Division misapplied the New York rule, that is strictly an issue of state law beyond the purview of this Court in a federal habeas petition.

With respect to the federal evidentiary claim, Respondent contends that Picente's claim is unexhausted because, in presenting his claims to the state courts, Picente relied solely on state law grounds.  This Court agrees.  This Court may not consider claims that have not been fairly presented to the state courts.[51]  A petitioner satisfies the fair presentation aspect of the exhaustion requirement by presenting the essential factual and legal premises of his federal constitutional claim to the appropriate state courts.[52]  An issue is exhausted when the substance of a federal claim is clearly raised and decided in the state court proceedings, irrespective of the label used.[53]  Exhaustion does not require that Picente have cited the "book and verse on the federal constitution."[54]  A petitioner who does not cite "book and verse of the Constitution" may nonetheless "fairly present to the state courts the constitutional nature of his claim" through:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c)

---

[49] *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006).

[50] *Id.* (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)).

[51] 28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing cases).

[52] *Acosta v. Artuz*, 575 F.3d 177, 185 (2d Cir. 2009) (citing *Reese*, 541 U.S. at 30-34); *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005).

[53] *Jackson v. Edwards*, 404 F.3d 612, 619 (2d Cir. 2005).

[54] *Picard v. Connor*, 404 U.S. 270, 278 (1971).

> assertion of the claim in terms so particular as to call to mind a specific right
> protected by the Constitution, and (d) allegation of a pattern of facts that is well
> within the mainstream of constitutional litigation.[55]

Picente did not anticipate the failure to exhaust defense in his petition.  By failing to traverse the answer, Picente has failed to properly join the exhaustion issue.  Moreover, the record before this Court does not show that Picente fairly presented the constitutional nature of his second ground to the state courts.

In this case, Picente does not prevail on the merits.[56]  Picente has failed to argue, let alone establish, that the prior statements and grand jury testimony were inadmissible under any ruling of the Supreme Court.  Admission of the challenged statements and grand jury testimony, as prior inconsistent statements, did not violate a well-established exception to the hearsay rule.[57]  Nor, because the declarants testified at trial, did admission of the prior statements and testimony violate the Confrontation Clause.[58]  Picente has failed to raise a viable claim of constitutional dimension cognizable in this Court in a federal habeas proceeding.[59]  Picente is not entitled to relief under his second ground.

## V.  CONCLUSION AND ORDER

Picente is not entitled to relief on any ground raised in his Petition.  Accordingly,

---

[55] *Daye v. Attorney General*, 696 F.2d 186, 194 (2d Cir. 1982) (en banc).

[56] 28 U.S.C. § 2254(b)(2) (a court may deny a petition on the merits notwithstanding the failure to exhaust state court remedies).

[57] *See Ohio v. Roberts*, 448 U.S. 56, 66 (1980), *overruled on other grounds by Crawford v. Washington,* 541 U.S. 36 (2004).

[58] *Crawford*, 541 U.S. at 51–52.

[59] *See Sanchez-Llamas*.

17

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.[60]  Any further request for a Certificate of Appealability must be addressed to the

Court of Appeals.[61]

The Clerk of the Court is to enter final judgment accordingly.

Dated:  April 28, 2010.

/s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge

---

[60] 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) ("reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further") (internal quotation marks omitted).

[61] *See* Fed. R. App. P. 22(b); Second Circuit R. 22.